**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **UZOMA OLUMBA,** | ) | |
| **4402 Braeside Court,** | ) | |
| **Lanham, MD 20705,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 1:15-cv-00914** |
| | ) | |
| **LEGAL SERVICES CORPORATION** | ) | |
| **OFFICE OF INSPECTOR GENERAL,** | ) | |
| **3333 K Street, NW** | ) | |
| **Third Floor** | ) | |
| **Washington, DC 20007** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____ )

**COMPLAINT FOR DECLARATORY, INJUNCTIVE,**
**AND MONETARY RELIEF AND JURY DEMAND**

**INTRODUCTION**

1. This is an action against Defendant, Legal Services Corporation's Office of the Inspector
   General ("Defendant" or "the LSC"), for declaratory and injunctive relief and monetary
   damages.  This Complaint seeks to redress harm that Plaintiff, Mr. Uzoma Olumba ("Plaintiff
   or "Mr. Olumba"), suffered as a result of the LSC's discriminatory conduct based against
   him.

**JURISDICTION AND VENUE**

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because the
   parties reside in different jurisdictions and the amount in controversy exceeds $75,000.00.
   Plaintiff is a Maryland resident and Defendant's headquarters are Washington, D.C.  Plaintiff
   seeks damages not less than $100,000.

1

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because the parties reside in different jurisdictions and the amount in controversy exceeds $75,000.00.

4. Venue is proper under 28 U.S.C. § 1391(b)(2), as the events or omissions giving rise to Plaintiff's claims occurred in the District of Columbia.

## PARTIES

5. Plaintiff, Uzoma Olumba, is an adult resident of Maryland, and was at all times relevant to this Complaint an employee of Legal Services Corporation's Office of the Inspector General.

6. Defendant, Legal Services Corporation's Office of the Inspector General, is an independent 501(c)(3) nonprofit corporation, located in Washington, D.C.  At all times relevant to this Complaint, the Legal Services Corporation's Office of the Inspector General was Mr. Olumba's employer.

## FACTUAL ALLEGATIONS

7. Mr. Olumba began working for the Legal Services Corporation (LSC) Office of Inspector General (OIG) on July 9, 2007 as an auditor.

8. On Mr. Olumba's 90 Day Review Form, his supervisor indicated that Mr. Olumba's performance was satisfactory.

9. On March 27, 2008, Mr. Olumba was given his 2007 performance review. On the Annual Performance Appraisal Form, Mr. Olumba was given the overall performance rating of "Fully Successful."

10. On August 5, 2008, the HR Director, Alice Dickerson, approved a 1.99% salary adjustment for Mr. Olumba.  Shortly thereafter his salary increase was raised to 5.47% in recognition of Mr. Olumba strong performance.

11. On July 20, 2011, Mr. Olumba was given performance evaluations for his work during 2009 and 2010. On his Annual Performance Appraisal Form, Mr. Olumba's supervisor indicated that Mr. Olumba's work was "Fully Successful."

12. On October 24, 2012, Mr. Olumba was given his 2011 performance evaluation. On his Annual Performance Appraisal Form, Mr. Olumba's supervisor indicated that his overall performance was "Fully Successful."

<u>Mr. Olumba is Discriminated Against Because of His Race</u>

13. Mr. Olumba observed several racially discriminatory practices which he discussed with his fellow African American colleagues.  In most cases, these colleagues initiated the conversations with Plaintiff.

14. Lisa Buffalo, one of Mr. Olumba's colleagues, told him that it seemed discriminatory for LSC to keep all of the black employees in a cubicle space while non-black employees were given offices.

15. Another employee, Eric Hagerstrom, frequently commented about ongoing discrimination to Mr. Olumba and Mr. Gatere, another black employee, and tried to convince them to take legal action against management, including filing charges with the EEOC and starting a union.

16. Two employees in the library told Mr. Olumba that at the time he and Mr. Gatere were hired, an email was circulated that stated that that the OIG just hired "two monkeys."

17. About two to three years into his employment with LSC, Mr. Olumba applied for a senior auditor position. Mr. Olumba was already doing a lot of the work required for the position and, in fact, he was doing the same work as other auditors with the senior title.

18. When Mr. Olumba was interviewed for the senior auditor position in 2010, the interviewers questioned him on his employment history and whether he met the time requirement for the position.

19. The interviewers instructed Mr. Olumba to prepare a schedule of hours worked on the jobs listed on his resume.

20. Mr. Olumba had used the same resume when he applied for the auditor job with LSC OIG and had already discussed his employment history at length during his initial interview.

21. Immediately following this interview, Mr. Olumba approached Human Resources employee Tracy Busbee to ask about what had happened in the interview as well as what had been happening within the OIG from the beginning of his employment, including:

    - Performing the same work as other senior staff without being paid the same wages;

    - Not being provided with timely performance appraisals;

    - Comments about the appearance of discrimination in the office; and

    - Not being provided with a career track that would allow for advancement.

22. Mr. Olumba's complaints were shared with Human Resources Director, Alice Dickerson.

23. In response to Mr. Olumba's complaint, LSC gave the OIG more office space and moved the audit staff downstairs. Mr. Olumba was given his own office.

24. LSC changed the structure of the audit unit and created two team leader positions.

25. LSC also conducted a job responsibilities study which resulted in certain employees being reclassified as hourly, rather than salary. Mr. Olumba was not reclassified and, as a result, made less money than other employees with fewer responsibilities.

26. Mr. Olumba asked management why he was not reclassified and requested a job description. Management said there was no job description and provided no further information.

### LSC Retaliates Against Mr. Olumba Because of His Complaint

27. Following his complaint, beginning in 2010, OIG leadership refused to speak with Mr. Olumba or even make eye contact with him.

28. From 2010 onward, Management would sabotage his projects and set him up to fail by:

- Not giving Mr. Olumba enough resources especially when leading projects (Mr. Olumba led project(s) in 2012 – NY audit (Hudson Valley))

- Not allowing enough time for planning;

- Not allowing enough time to executive a plan;

- Not allowing return visits to auditees as allowed to other senior auditors; and

- Giving instructions and then later claiming that different instructions were given and not followed.

29. Mr. Olumba was repeatedly denied training opportunities made available to others between 2010 to 2014.

30. Since 2010, Mr. Olumba was denied advancement opportunities and wage and title while still being made to do the work for positions with higher titles and higher compensation.

31. In 2012, LSC cancelled Mr. Olumba's compressed work schedule for reasons outside of Mr. Olumba's control. This had never been done to any other employee.

32. Mr. Olumba's work in the paperless workpaper system was inappropriately changed without his consent since its implementation in 2012/2013.

33. Mr. Olumba was pressured by management to engage in unethical conduct (to favor auditees that held political persuasion/connections) while performing audits.

34. In October 2013, Mr. Olumba's supervisor informed Mr. Olumba that management was holding meetings on how to retaliate against him.

35. Mr. Olumba's supervisor advised that Mr. Olumba should not go to Human Resources with complaints, as Human Resources was part of these meetings, and instead, Mr. Olumba should filed a complaint with the EEOC.

36. Mr. Olumba was confused and a few days later went to the Director of Human Resources to make a formal complaint. His complaints included: not being reclassified as an hourly employee, increased responsibilities/duties where he was doing the same work as senior staff without the same pay, reports being held up by OIG management with blame being placed on the auditors, being instructed by management to engage in unethical conduct when conducting audits and then being punished for not complying, and lastly, feeling retaliated against for his initial complaint of discrimination.

37. The Director of Human Resources, Tracy Higgins, did not process the complaint as outlined in the employee manual, as requested by Mr. Olumba; however,

38. Ms. Higgins pressured Mr. Olumba not to move forward with the complaint.

39. Ms. Higgins informed Mr. Olumba that if he took any legal action, staff members would not corroborate his story.

<u>LSC Interferes with Mr. Olumba's Efforts to Unionize</u>

40. After making a formal complaint in October 2013, Mr. Olumba found it necessary for the audit unit to join the LSC union.

41. Mr. Olumba began to discuss the idea of unionizing with his co-workers who requested Mr. Olumba provide them with more information and set up meetings.

42. Mr. Olumba met with the LSC union leadership and representatives from the International Federation of Professional and Technical Engineers and was provided brochures.

43. Mr. Olumba distributed the union brochures to his co-workers.

44. The OIG management learned of Mr. Olumba's efforts to unionize and the environment was made even more hostile for Mr. Olumba.

45. The IG called a meeting with the audit staff and told everyone that he would consider it a personal betrayal if the OIG's staff were to unionize.

46. After this meeting, anytime Mr. Olumba tried discussing the idea of a union with a co-worker, the Assistant Inspector General for Investigations would show up.

LSC Interferes with Mr. Olumba's FMLA Leave

47. In or around March 2011, Mr. Olumba began suffering from a then undiagnosed medical condition.

48. In 2011, Mr. Olumba's illness was causing him to miss work frequently and his physician recommended he take FMLA leave. When Mr. Olumba informed management, he was told to continue to use sick leave and not to take FMLA leave. Mr. Olumba felt intimidated and followed management's instructions rather than his doctor's.

49. Throughout his employment between 2011 to 2013, Mr. Olumba's medical condition continued to worsen. By March 2014, Mr. Olumba's condition had declined so severely that his primary care physician told him he had to absolutely use his FMLA leave to take a significant break from work.

50. Mr. Olumba contacted Human Resources Director Tracie Higgins and asked her for the necessary FLMA forms. Ms. Higgins refused to provide the forms to him and told Mr. Olumba that he needed to be out of work for three consecutive days before she would provide him with the FMLA forms.

51. After Mr. Olumba had been out of work for three consecutive days, he once again contacted Ms. Higgins. She again refused to provide the requested forms, this time telling Mr. Olumba

that he needed to be out of work for five consecutive days before she would provide him with the FMLA forms.

52. After Mr. Olumba had been out of work for five consecutive days, he again contacted Ms. Higgins for the necessary forms. Once again, Ms. Higgins refused to provide them.

53. Mr. Olumba informed his primary care physician, Dr. Brown that Human Resources was refusing to provide him with the FMLA forms he needed. Dr. Brown instructed Mr. Olumba to contact Human Resources while still at Dr. Brown's office. Only then were the forms provided to Mr. Olumba by Human Resources.

54. Mr. Olumba's physician completed the forms, indicating that Mr. Olumba needed three months of FMLA leave.

55. Mr. Olumba submitted the FMLA form requesting three months of leave. LSC did not approve the request and told Mr. Olumba that there were issues with the form and to take them back to his primary care physician for corrections.

56. Each time Mr. Olumba returned to his primary care physician to have Dr. Brown review and correct the forms, Dr. Brown informed Mr. Olumba that there was nothing wrong with the forms. Mr. Olumba requested LCS contact his primary care physician directly in order to discuss the issues they had with the forms.  LSC refused to do so.

57. During the time Mr. Olumba was waiting for his leave to be approved, he told the Inspector General, Jeff Schanz, that he would be taking FMLA leave for three consecutive months. Mr. Schanz made several intimidating comments to Mr. Olumba. Mr. Schanz said he could not understand why a young, able-bodied man was so sick and needed so much time out of work; that when he was Mr. Olumba's age, he was never sick. Mr. Schanz also said that when he

was working for the Justice Department, he had a stroke and, afterwards, simply told his manager and then went back to work.

58. Also during the time Mr. Olumba was waiting for his leave to be approved, an individual in Human Resources disclosed the details of Mr. Olumba's medical issues to his colleagues. After learning the details, one employee, Cynthia Robinson, went to Mr. Olumba's cubicle area, talked with his about his condition, and called Mr. Olumba "crazy."

59. Mr. Olumba was concerned that if he took 3 full months of FMLA leave (as his doctor had recommended) that he would face negative professional repercussions from his supervisors. Caving to the pressure, Mr. Olumba returned to his physician and requested his leave form be changed to "as needed." His physician reluctantly agreed.

60. Once Mr. Olumba changed his FMLA request from three months to "as needed," LSC approved the leave form.

61. Mr. Olumba returned to LSC to speak with the Audit Director. The Director told Mr. Olumba, "I'll give you two months to get well" and that during those two months, he was to charge his time as admin leave.

62. The Director then told Mr. Olumba that he was not a good auditor and should seek other types of work. Mr. Olumba had never before received a negative performance evaluation.

63. During his two months of leave, Mr. Olumba stayed at home and continued to seek medical treatment. He did, however, continue to do some work on a project to which he was assigned as the auditor in charge.  He performed this work because he was concerned that his projects be completed properly.

64. As instructed, Mr. Olumba charged his time as admin leave until the Finance and Human Resources department eventually told him to discontinue that practice.

65. At the end of his two-month leave period, Mr. Olumba was terminated.

## STATEMENT OF CLAIMS

## COUNT I: INTERFERANCE AS UNDER THE FMLA

66. Mr. Ozuma incorporates all the allegations contained in paragraphs 1-65 as if stated herein.

67. Under the FMLA "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 USC § 2615 (a)(1). Additionally under the regulations, "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 CFR § 825.220.

68. To establish an unlawful interference with an entitlement to FMLA benefits, an employee must prove that: (1) he was an eligible employee; (2) his employer was covered by the statute; (3) he was entitled to leave under the FMLA; (4) he gave his employer adequate notice of his intention to take leave; and (5) the employer denied him FMLA benefits to which he was entitled. *Deloatch v. Harris Teeter, Inc.*, 797 F. Supp. 2d 48, 56 (D.D.C. 2011).

69. Actions that constitute "interfering with an employee's FMLA rights include refusing to authorize FMLA leave; discouraging an employee from using such leave; avoiding responsibilities under FMLA; and using the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(b) and(c).  Prejudice exists if compensation and benefits are lost by reason of the violation, 29 U.S.C. § 2617(a)(1)(A)(i)(I), other monetary losses are sustained as a direct result of the violation, 29 U.S.C. § 2617(a)(1)(A)(i)(II), or the employee is denied employment, reinstatement, or promotion, 29 U.S.C. § 2617(a)(1)(B).

70. In the instant case, LSC is an eligible FMLA employer.

71. Mr. Olumba took ongoing FMLA leave within the period of two months for serious health conditions (as that term is defined by the FMLA).

72. His employer was on notice of the FMLA leave because the employer approved it.  Although Mr. Olumba's Doctor recommended he use 3 consecutive months of FMLA leave, Mr. Olumba was intimidated and forced to use a maximum of 2 months of FMLA leave on an ongoing/as needed basis.  Mr. Olumba was not allowed to return from FMLA leave.  LSC considered Mr. Olumba request for FMLA leave as a negative factor and terminated Mr. Olumba while he was still out on leave.

73. Any or all of these negative or willful acts and consequences by LSC has had a chilling effect on Mr. Olumba's exercise of his FMLA rights. See Stallings v. Hussmann Corp, 447 F.3d 1041, 1050 (8th Cir. 2006) (An employer interferes with an employee's FMLA rights "[w]hen an employer attaches negative consequences to the exercise of protected rights, it has `chilled' the employee's willingness to exercise those rights….")

74. As a direct and proximate result of the acts and omissions of Defendant as described above, Mr. Olumba suffered loss of pay and benefits, including, but not limited to, salary, bonuses, health insurance, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT II: INTERFERANCE AS UNDER THE DCFMLA

75. Mr. Olumba incorporates all the allegations contained in paragraphs 1-74 as if stated herein

76. D.C. Code §32-507(a) provides that "it shall be unlawful for any person to interfere, restrain, or deny the exercise of or the attempt to exercise any right provided by this chapter . . . ." "If an employer interferes with the FMLA-created right to medical leave or to reinstatement

following the leave, a deprivation of this right is a violation regardless of the employer's intent." *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d, 955, 960 (10th Cir.2002);  see also *Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 331 (1st Cir.2005) ("no showing as to employer intent is required").

77. An employer interferes with protected rights when it interferes with, restrains, or denies the exercise of any right provided by the Acts. 29 U.S.C. § 2615(a)(1); D.C. Code § 32-507. Prejudice exists where an employee loses compensation or benefits by reason of the violation, sustains other monetary losses as a direct result of the violation, or suffers some loss in employment status remediable through appropriate equitable relief. 29 U.S.C. § 2617(a)(1); D.C. Code § 32-509(b)(6) (allowing also consequential damages).

78. Employers can be held liable both for denying their employees statutory leave and also for interfering with their exercise of those rights, short of an outright denial. See McFadden, 611 F.3d at 7. *McFadden v. Ballard, Spahr, Andrews & Ingersoll, LLP*, 611 F.3d 1, 7 (D.C. Cir. June 29, 2010).

79. As stated, Mr. Olumba's doctor recommended he use 3 consecutive months of FMLA leave.

80. Mr. Olumba was concerned that if he took 3 full months of FMLA leave (as his doctor had recommended) that he would face negative professional repercussions from his supervisors. Caving to the pressure, Mr. Olumba returned to his physician and requested his leave form be changed to "as needed." His physician reluctantly agreed.

81. Although Mr. Olumba was intimidated and forced to use a maximum of 2 months of FMLA leave on an ongoing/as needed basis.  Mr. Olumba was not allowed to return from FMLA leave.  LSC considered Mr. Olumba request for FMLA leave as a negative factor and terminated Mr. Olumba while he was still out on leave.

82. As a direct and proximate result of the acts and omissions of Defendant as described above, Mr. Olumba suffered loss of pay and benefits, including, but not limited to, salary, bonuses, health insurance, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT III: RETALIATION AS UNDER THE FMLA

83. Mr. Olumba incorporates all the allegations contained in paragraphs 1-82 as if stated herein.

84. Under the FMLA, it is an unlawful employment practice for an employer to retaliate against any individual on account of having exercised any right protected under this statute. 29 U.S.C. § 2615(a)(2).

85. To establish retaliation under the FMLA, the employee must show that: (1) he was "engaged in protected activity under the statute"; (2) he "was adversely affected by an employment decision;" and (3) "the protected activity and the adverse employment action were causally connected." *Glenkin v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1368 (D.C. Cir. 2000).

86. Mr. Olumba engaged in protected activity by taking FMLA leave.

87. Mr. Olumba was adversely affected by LSC's decision to terminate Mr. Olumba's employment.

88. A strong inference of causal connection between Mr. Olumba's FMLA leave and subsequent termination can be made based on the temporal proximity of the two events along with the extreme hostility of LSC when handling Mr. Olumba's multiple FMLA requests.

89. There was no legitimate, nondiscriminatory reason for Mr. Olumba's termination. Prior to his FMLA request in 2014, Mr. Olumba had never received a negative performance evaluation. Any claims of inadequate performance by LSC are merely pretext for discrimination and prohibited under the FMLA.

90. As a direct and proximate result of the acts and omissions of Defendant as described above, Mr. Olumba suffered loss of pay and benefits, including, but not limited to, salary, bonuses, health insurance, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

### COUNT IV: RETALIATION AS UNDER THE DCFMLA

91. Mr. Olumba incorporates all the allegations contained in paragraphs 1-90 as if stated herein

92. D.C. Code §32-501 *et seq*., employment is protected/secured when taking medical leave under DCFMLA.  D.C. Code §32-507(b)(1) makes it "unlawful for an employer to discharge or discriminate in any manner against any person because the person  . [o]pposes any practice made unlawful by this chapter." (2001).

93. Courts interpret the FMLA and the DCFMLA similarly. *See Winder v. Erste, 511 F. Supp. 2d 160, 184 (D.D.C. 2007)*  To establish a prima facie case, an employee must show: (a) s/he engaged in protected activity; (b) s/he suffered an adverse employment action; and (c) the protected activity and the adverse employment action were causally connected. *See* Winder, 511 F. Supp. 2d at 184 (noting also that the elements of a prima facie case are the same under both Acts).

94. As stated before, Mr. Olumba engaged in protected activity by taking DCFMLA leave.

95. Mr. Olumba was adversely affected by LSC's decision to terminate Mr. Olumba's employment.

96. A strong inference of causal connection between Mr. Olumba's DCFMLA leave and subsequent termination can be made based on the temporal proximity of the two events along with the extreme hostility of LSC when handling Mr. Olumba's multiple FMLA requests.

97. There was no legitimate, nondiscriminatory reason for Mr. Olumba's termination. Prior to his FMLA request in 2014, Mr. Olumba had never received a negative performance evaluation. Any claims of inadequate performance by LSC are merely pretext for discrimination and prohibited under the DCFMLA.

98. As a direct and proximate result of the acts and omissions of Defendant as described above, Mr. Olumba suffered loss of pay and benefits, including, but not limited to, salary, bonuses, health insurance, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

### COUNT V: RACE DISCRIMINATION IN VIOLATION OF EQUAL RIGHTS UNDER THE LAW 42 U.S.C. §1981

99. Mr. Olumba incorporates all the allegations contained in paragraphs 1-98 as if stated herein

100.    All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. 42 U.S.C. §1981.

101.    Section 1981 prohibits private employers from intentionally discriminating on the basis of race with respect to the "benefits, privileges, terms, and conditions" of employment. 42

U.S.C. § 1981; MAGLOIRE K. PLACIDE AYISSI v. Fannie Mae, et.al; see Runyon v.

McCrary, 427 U.S. 160, 170 (1976).  In Section 1981 and Title VII cases, courts use the

same framework for determining whether unlawful discrimination occurred.  See generally

ROTHSTEIN ET A., EMPLOYMENT LAW § 2.40 (4th ed. 2009); see also U.S. Postal

Service Board of Governors v. Aikens, 460 U.S. 711 (1983); McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973).

102.    During his employment, Mr. Olumba observed several racially discriminatory practices

which he discussed with his fellow African American colleagues.  After informing HR of

this, management made him a target for ostracism and ridicule.   They did this by holding

meetings on how to retaliate against Mr. Olumba and circulating racist emails which trickled

down to other staff.

103.    By the conduct described above, defendant LSC intentionally deprived Mr. Olumba the

same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all

benefits and privileges, of their contractual employment relationship with LSC, in violation

of 42 U.S.C. §1981.

104.    As a result of defendant LSC' discrimination in violation of Section 1981, Mr. Olumba

has been denied employment opportunities providing substantial compensation and benefits,

thereby entitling him to injunctive and equitable monetary relief; and has suffered anguish,

humiliation, distress, inconvenience and loss of enjoyment of life because of LSC' actions,

thereby entitling him to compensatory damages.

105.    In its discriminatory actions as alleged above, LSC has acted with malice or reckless

indifference to the rights of Mr. Olumba, thereby entitling him to an award of punitive

damages.

106.    To remedy the violations of the rights Mr. Olumba secured by Section 1981, Mr. Olumba

request that the Court award him the relief prayed for below.

**COUNT VI: HOSTILE WORK ENVIRONMENT IN VIOLATION OF EQUAL
RIGHTS UNDER THE LAW 42 U.S.C. §1981**

107.    Mr. Olumba incorporates all the allegations contained in paragraphs 1-106 as if stated

herein.

108.    All persons within the jurisdiction of the United States shall have the same right in every

State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the

full and equal benefit of all laws and proceedings for the security of persons and property as

is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes,

licenses, and exactions of every kind, and to no other. 42 U.S.C. §1981.

109.    To prevail on a hostile work environment claim, a plaintiff must first show that he or she

was subjected to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe

or pervasive to alter the conditions of the victim's employment and create an abusive

working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting

Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)).

110.    In evaluating a hostile work environment claim, the court "looks to the totality of the

circumstances, including the frequency of the discriminatory conduct, its severity, its

offensiveness, and whether it interferes with an employee's work performance." Baloch v.

Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing Faragher v. City of Boca Raton,

524 U.S. 775, 787 - 88 (1998)).

111.    Throughout his employment, Mr. Olumba, following his initial complaint, OIG leadership

refused to speak with Mr. Olumba or even make eye contact with him. Management would

sabotage his projects and set him up to fail. Mr. Olumba was denied training opportunities made

available to others.  LSC cancelled Mr. Olumba's compressed work schedule for reasons outside of Mr. Olumba's control. This had never been done to any other employee. Mr. Olumba's work in the paperless workpaper system was inappropriately changed without his consent. Mr. Olumba was pressured by management to engage in unethical conduct (to favor auditees of a particular political party) while performing audits.

112.    Mr. Olumba also learned through his supervisors, that management was holding meetings on how to retaliate against him.

113.    Ms. Higgins pressured Mr. Olumba not to move forward with the complaint.

114.    Ms. Higgins informed Mr. Olumba that if he took any legal action, staff members would not corroborate his story.

115.    By the conduct described above, defendant LSC intentionally deprived Mr. Olumba the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of their contractual employment relationship with LSC, in violation of 42 U.S.C. §1981.

116.    As a result of defendant LSC' discrimination in violation of Section 1981, Mr. Olumba has been denied employment opportunities providing substantial compensation and benefits, thereby entitling him to injunctive and equitable monetary relief; and has suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of LSC' actions, thereby entitling him to compensatory damages.

117.    In its discriminatory actions as alleged above, LSC has acted with malice or reckless indifference to the rights of Mr. Olumba, thereby entitling him to an award of punitive damages.

118.    To remedy the violations of the rights Mr. Olumba secured by Section 1981, Mr. Olumba

request that the Court award him the relief prayed for below.

### COUNT VII: RETALIATION IN VIOLATION OF EQUAL RIGHTS UNDER THE LAW 42 U.S.C. §1981

119.    Mr. Olumba incorporates all the allegations contained in paragraphs 1-118 as if stated

herein

120.    All persons within the jurisdiction of the United States shall have the same right in every

State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the

full and equal benefit of all laws and proceedings for the security of persons and property as

is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes,

licenses, and exactions of every kind, and to no other. 42 U.S.C. §1981

121.    To establish a retaliation claim under Section 1981, a plaintiff must show that he engaged

in protected activity and that his employer took an adverse employment action against him

because of that activity. *See Holcomb v. Powell*, 433 F.3d 889, 901- 02 (D.C. Cir. 2006).

122.    Mr. Olumba, made a complaint identifying discrimination to LSC HR.  After doing so,

OIG leadership refused to speak with Mr. Olumba or even make eye contact with him.

Management would sabotage his projects and set him up to fail. Mr. Olumba was denied

training opportunities made available to others.  LSC cancelled Mr. Olumba's compressed

work schedule for reasons outside of Mr. Olumba's control. This had never been done to any

other employee. Mr. Olumba's work in the paperless workpaper system was inappropriately

changed without his consent. Mr. Olumba was pressured by management to engage in

unethical conduct (to favor auditees of a particular political party) while performing audits.

123.    Mr. Olumba also learned through his supervisors, that management was holding meetings

on how to retaliate against him.

124.     Ms. Higgins pressured Mr. Olumba not to move forward with the complaint.

125.     Ms. Higgins informed Mr. Olumba that if he took any legal action, staff members would

not corroborate his story.

126.     By the conduct described above, defendant LSC intentionally deprived Mr. Olumba the

same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all

benefits and privileges, of their contractual employment relationship with LSC, in violation

of 42 U.S.C. §1981.

127.     As a result of defendant LSC' discrimination in violation of Section 1981, Mr. Olumba

has been denied employment opportunities providing substantial compensation and benefits,

thereby entitling him to injunctive and equitable monetary relief; and has suffered anguish,

humiliation, distress, inconvenience and loss of enjoyment of life because of LSC' actions,

thereby entitling him to compensatory damages.

128.     In its discriminatory actions as alleged above, LSC has acted with malice or reckless

indifference to the rights of Mr. Olumba, thereby entitling him to an award of punitive

damages.

129.     To remedy the violations of the rights Mr. Olumba secured by Section 1981, Mr. Olumba

request that the Court award him the relief prayed for below.

**COUNT VIII: RACE DISCRIMINATION IN VIOLATION OF TITLE VII OF THE
CIVIL RIGHTS ACT OF 1964 AND THE DISTRICT OF COLUMBIA HUMAN
RIGHTS ACT OF 1977**

130.     Mr. Olumba incorporates all the allegations contained in paragraphs 1-129 as if stated

herein.

131.    Under Title VII and the DCHRA, it is an unlawful employment practice for an employer

to discriminate against any individual with respect to the terms, conditions, or privileges of

employment because of an individual's race.  42 U.S.C. § 2000e-2(a); D.C. Code § 2-1401.1.

132.    During his employment, Mr. Olumba observed several racially discriminatory practices

which he discussed with his fellow African American colleagues.  After informing HR of

this, management made him a target for ostracism and ridicule.   They did this by holding

meetings on how to retaliate against Mr. Olumba and circulating racist emails which trickled

down to other staff.

133.    As a direct and proximate result of the acts and omissions of Defendant as described

above, Mr. Olumba suffered loss of pay and benefits, including, but not limited to, salary,

bonuses, diminished future earning capacity, emotional pain and suffering, inconvenience,

mental anguish, loss of enjoyment of life, and other pecuniary and non-pecuniary losses.

**COUNT IX: RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL
RIGHTS ACT OF 1964 AND THE DISTRICT OF COLUMBIA HUMAN RIGHTS
ACT OF 1977**

134.    Mr. Olumba incorporates all the allegations contained in paragraphs 1-133 as if stated

herein.

135.    Under Title VII and the DCHRA, it is an unlawful employment practice for an employer

to retaliate against any individual on account of having exercised any right protected under

the statutes or because that person has opposed any practice made unlawful by the statutes.

29 U.S.C. § 623(d); 42 U.S.C. § 2000e-3(a); D.C. Code § 2-1402.61.

136.    As alleged herein, Defendant, by and through its officers, managing agents, and/or its supervisors,

illegally retaliated against Mr. Olumba by subjecting him to unjust scrutiny and failing to promote

him or transfer him to another position solely because he had reported the aforementioned race

discrimination.  Defendant had no legitimate reasons for any such act.  Each said act of retaliation is in violation of Title VII and the DCHRA.

137.    Between 2010 to 2013, following his initial discrimination complaint, Mr. Olumba experienced hostility amongst management when OIG leadership refused to speak with Mr. Olumba, make eye contact with him, and, at least on one occasion, yell at him.  Management intentionally set Mr. Olumba up to fail by:

- Not giving Mr. Olumba enough resources;

- Not allowing enough time for planning;

- Not allowing enough time to executive a plan;

- Not allowing return visits to auditees as allowed to other senior auditors;

- Giving instructions and then later claiming that different instructions were given and not followed; and

- Cancelling projects he led in 2012 and 2013 respectively.

138.    Mr. Olumba is informed and believes, and based thereon alleges, that Defendant's conduct as described above was willful, wanton, malicious, and done in disregard for the safety and well-being of Mr. Olumba.

139.    As a direct and proximate result of the acts and omissions of Defendant as described above, Mr. Olumba suffered loss of pay and benefits, including, but not limited to, salary, bonuses, health insurance, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT X: VIOLATION OF THE FAIR LABOR STANDARDS ACT AND THE D.C. WAGE PAYMENT AND COLLECTION LAW

140.   Mr. Olumba incorporates all the allegations contained in paragraphs 1-139 as if stated herein.

141.   While employed by Defendant, Mr. Olumba worked overtime hours that were not properly compensated by Defendant as required by the FLSA and DCWPCL.

142.   Defendant failed to compensate Mr. Olumba at the rate of one and a half times his normal hourly rate for all hours worked in excess of forty hours per week.

143.   Defendant's actions complained of constitute a willful violation of Section 207 of the FLSA and Section 32-1003(c) of the D.C. Wage Payment and Collection Law.

144.   Defendant's violation makes it liable for Mr. Olumba's unpaid overtime compensation and an additional equal amount as liquidated damages.

## COUNT XI: VIOLATION OF THE NATIONAL LABOR RELATIONS ACT

145.   Mr. Olumba incorporates all the allegations contained in paragraphs 1-_ as if stated herein.

146.   An employer is prohibited from "interfering with, restraining, or coercing employees in the exercise of their rights" to unionize. 29 U.S.C. §158(a)(1).

147.   The IG's statement that he would consider it a personal betrayal if the OIG were to join the union was "not cast as a prediction of 'demonstrable economic consequences,' but rather as a threat of retaliatory action." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 619 (1969).

## PRAYER FOR RELIEF

**NOW, WHEREFORE,** Mr. Olumba prays this Court to:

a.   Enter judgment in his favor against Defendant for discrimination, retaliation, and unlawful termination;

b.   Award Mr. Olumba compensation of lost wages, including back pay and prejudgment interest;

c.   Award Mr. Olumba compensation of for unpaid overtime

d.   Award Mr. Olumba compensatory damages in an amount to be shown at trial, but in no event less than $100,000;

e.   Award Mr. Olumba punitive damages in an amount to be shown at trial;

f.   Award Mr. Olumba reimbursement of the attorneys' fees and costs he has expended in litigating this matter; and

g.   Grant him such other and further relief as justice may require, including but limited to front pay.

## JURY DEMAND

Mr. Olumba seeks trial by jury on all matters and issues that can be so tried.


Dated: June 15, 2015                              Respectfully submitted,


                                        ____/s/ Ari M. Wilkenfeld____
                                        Ari M. Wilkenfeld (Bar No. 461063)
                                        The Wilkenfeld Law Group
                                        1726 Connecticut Avenue, NW
                                        Suite 200
                                        Washington, DC 20009
                                        T: 202.765.2253
                                        F: 202.600.2792
                                        ari@wilkenfeldlaw.com


                                        ____/s/ Rosalind H. Herendeen__
                                        Rosalind H. Herendeen (Bar No. 1021518)
                                        The Wilkenfeld Law Group
                                        1726 Connecticut Avenue, NW
                                        Suite 200
                                        Washington, DC 20009
                                        T: 202.765.2253
                                        F: 202.600.2792
                                        rosalind@wilkenfeldlaw.com



                                        ____/s/ Chioma J. Ohanyerenwa
                                        Chioma J. Ohanyerenwa (Bar No. 1001666)
                                        420 Taylor St NE,
                                        C13
                                        Washington, DC 20017
                                        T: 202.657-7074
                                        c.j.ohanyere@gmail.com